Thank you, Your Honors, and good morning. May it please the Court, I'm Michael Byrne for Appellant XP Power. In this case, the trial court made a series of significant errors that require a new trial on liability or, at minimum, substantial changes to the court's final judgment on remedies. Although there are a number of issues to cover, we'd like to start with the liability issues and first with what both parties agree to be the court's instruction, whereby it turned an important element of a DTSA claim into an affirmative defense by placing the burden on the wrong party with respect to the issue of whether Comet's information was readily available by proper means. This is a good place to start because unless this is the rare case in which that instructional error is found harmless, the error would require a new trial on Trade Secrets D&E and make it unnecessary to decide many of the other issues. Can you walk us through how this happened? Because it's sad and unfortunate that we get through it. I mean, there's not enough trials as there are, and then you do it, and this is a pretty basic error. How did this happen? Yeah. Happy to talk through it. So before trial, both sides are submitting preliminary jury instructions, and it's not unusual in trade secret cases like this for a plaintiff to, before trial, maintain both a state trade secret law claim and a federal trade secret law claim. And what usually happens over the course of the case is that they will drop one of those claims and only go to the jury with one of those claims to avoid confusing the jury by the fact that there might be slight differences between state and federal law. And so early in the case, the parties are submitting preliminary jury instructions, but recognizing that they likely are going to have to change when, you know, if or when the issues are reduced to either the federal or the state trade secret claim. And that's basically what happened. When the comment dropped its California trade secret claim, the Court at ER 850 and 851 of the record said, this is probably a surprise to XP, and it's going to make a difference to our jury instructions. And so what I'm going to let both parties do is go off and tell me, how does the fact that Common is dropping its California trade secret claim, how does that affect the jury instructions? And so both parties went off, submitted in writing explanations of how the jury instructions should change, and both parties told the Court that the current sort of preliminary jury instruction needed to be changed to reflect the fact that under the DTSA, whether information is readily available by — I'm sorry, readily ascertainable by proper means is an element of the DTSA claim, not an affirmative defense. Notwithstanding that both parties told the Court that that needed to happen and be reflected in the jury instructions, the Court, without explanation, overruled both parties' filings and proceeded to keep it as an affirmative defense. Breyer. But you objected, because that's one of the arguments, is this was invited error. Yeah. No. I mean, we filed written objections. So I would point to E.R. 850, 851. The Court asked for parties to submit written objections, and then its decision, I think, is at E.R. 36, where it explicitly says what filings it's — what objections it's overruling. And our written objections, specifically, I think it's at 131, explain that the language needed to be changed to reflect that it was an element of the claim, not an affirmative defense. So you have this error. The Court has overruled both parties' objections, and it — and unfortunately, it's — you know, now goes to the jury that way. So, you know, the only other arguments that they make with respect to this, they try and suggest that this is — that this is harmless for two reasons. The first is that they say, well, don't worry about this erroneous instruction, because there's another instruction that was That instruction was, you know, sufficiently complete and fairly and correctly covered the substance of the applicable law. The problem with that is that if you look actually at their filings below, E.R. 133, they specifically objected to Instruction 18 as it was ultimately given to the jury, specifically for the reason that they said that it was incomplete because it did not instruct the jury on the readily ascertainable element of the DTSA claim. So they recognized that — that that instruction was incomplete and didn't get the information to the jury. The final argument that they tried — Although that was not accepted by the district court. I mean, are you arguing sort of an unclean hand, like they're taking — I mean, they said it was incomplete, but the district court could have — it overruled that, so it could have concluded that it was complete and thought that this covered that. But — well, the district court clearly didn't think that, because the district court believed that it was appropriate to instruct the jury separately on whether there was, you know, whether there was readily ascertainable information. They do seem to have different definitions, so I — yeah. They are — they are differently defined. The Ninth Circuit in the Chung case recognized that these are different elements of the claim, and Congress obviously made the decision to ask separately about whether this — So why don't you get to the factual harmless error? Yeah. So the final — the final piece that they argue about is — is harmlessness. And this is one, first of all, you know, recognize that they — they abated the burden to show harmlessness here, and I think, you know, this Court has explained in the Carvalho case and in the Blade Room case that these kinds of errors are rarely going to be harmless, because, you know, who bears the burden of proof is so, you know, fundamental to how the jury thinks about things. And here, with respect to the facts, they don't dispute that we put in evidence that — that speaks to whether this information was readily ascertainable by proper means. There was testimony from our expert about the fact that the core component of Trade Secret E was something that was in an AE match system. You know, I pointed to 741 of the record where he talks through. This is the kind of thing you could open up and figure out. There's some evidence, so — but, you know, is it more likely than — what's the standard? Is it more likely than not that — Well, probably than not. Right. So for me, what's — most material is — they put evidence saying that it's not — it's not readily ascertainable because nothing presented in the evidence shows the whole architecture of these trade secrets. And I haven't seen anything on the — on the other side saying that there was. So — so let me — happy to address that. So first of all, with respect to sort of what the trade secrets are, there's a lot of vagueness, I think, in the way that Plaintiff's — and this is not unusual in a trade secret case in terms of, like, how to characterize a trade secret. But it is certainly the case that what was presented to the jury as the core of what Trade Secret E and D were, were respectively the 4X sensor with respect to Trade Secret E and then this brain bug architecture with respect to Trade Secret D. There was definitely evidence that we put in the — in the record that — that suggested that both of those things could be readily ascertainable, either from looking at the AE match or from looking at publicly available patent information. And I think what you have to conclude on this is, you know, their response is essentially that, well, yes, maybe you could — I mean, I don't — I don't take them — I think in their brief, they come pretty close to saying, yes, it's possible that, you know, perhaps the components —  — of these trade secrets would have been, you know, readily ascertainable. But you could have figured out — Right. That's how I see it, that you might have put something that the components are out there, but nothing explains how it all works together. Right. Right? And so that is not readily ascertainable. Yeah. And so I think two things that I would say about that. I mean, first of all, right, so they basically said, well, maybe the what would have been in a red list but not the why. I don't think there's any way that you can conclude from the record and the jury's verdict that the jury would have reached the same outcome if it had been properly instructed on the burden of proof and concluded that, yes, the components are readily ascertainable, but the strategy behind why particular components were chosen — Okay. Do you concede, then, that your side put no evidence on this architecture strategy or the why? Well, we certainly didn't — yeah, we certainly aren't suggesting that by opening up an AE match, you could figure out why Comet made the choice — So there is a mismatch of evidence. So one — the way I see it, they brought broader evidence of readily ascertainable, and you brought narrower evidence. Is that a fair way to say it? I think what I would say is that the core of the trade secret and even the way that they packaged the core of the trade secret to the jury was again — and we talk about this in our reply brief — is it was the components, right? They're not saying that, hey, what's the trade secret here is why we chose these components. Because ultimately, when you're selling a product, right, what's important is, like, how does the product work, what does the product do. It's not why did we make that choice or what testing have we done separately with respect to that product. So whether or not that's valuable to them, the trade secret here is, you know, the proposed trade secret is this architecture and the sensor, the components. And that's — I think there's no question that we put in evidence that goes to that. But you would need to know why in order to build that. No, no. I think our — the testimony was that basically we would — that first of all, you'd be able to open the box. And again, I'd go to 741 for this. You could look at the components, understand where they were, and then build your own to match it. And we also have tests. We talked about this. But was there any evidence that that's what happened, that they looked at what's readily ascertainable, then figured out the why architecture? So that wouldn't be — so two things. I mean, first of all, that wouldn't be the relevant legal question. It's not about whether we actually did it. It's simply would it have been readily ascertainable. So in other words, what you're figuring out is, is it a trade secret as opposed to — So it's not relevant whether or not that's actually how you came up with — Right. That's a separate question because that goes to, like, whether there's misappropriation. So, like, in other words, if we had, like, put in evidence, hey, we in fact did this, then the jury could have concluded, okay, well, you got it by proper means, and so we're not — we don't have to deal with it. But I would say, you know, as to this, that there is evidence, and we pointed to this in our reply brief, that it's not just that we said, hey, you could figure out — you know, like, you could figure out the locations of these components. We also said someone who's skilled, a regular engineer, could look at those components and understand why they were where they were, what they were doing, why these — you know, why the information was used. Was this issue readily ascertainable a big issue in closing? Was that — It was presented in closing. I think one place, if I'm not mistaken, was — let me just see. I think it's 1064, if I'm not mistaken, where he says something like, you know, you heard anyone that buys a product can open it up, do with it whatever they want. Therefore, one can open up a match, look at the components. You know, so what does that mean? It means that Comet's alleged trade secrets are also readily ascertainable. So, you know, there are other places, too, but, you know, that's enough to show that this was something that was certainly before the jury. So we think on that issue, you know, it's clear that there's an error and you should reverse. And I will point out that just as in the Blade Room case, where they found an instructional error in reverse, they thought it was helpful to decide a few other issues that would be helpful for the court on remand. And so the one issue I would point you to specifically would also be helpful to provide some guidance to the court is on this evidentiary issue, the second issue that we present in our briefs. So as to that, the court deprived us of the ability to put in significant material evidence that showed that the core of the trade — of what Comet alleged to be the trade secret was actually information that was taken from a third party, Advanced Energy. And this was significant evidence. This was testimony from the — you know, this is testimony from the person who was ultimately, you know, found to have taken this information from Comet to XP, where he is saying, you know, with respect to the 4X sensor diagram, yeah, this is something that I did at AE. It's his resume showing that he, you know, worked on 4X sensors at AE. So that issue is very well developed in your briefs. I wonder if we could ask you about another issue that might need to be addressed or might helpfully be addressed if we need to remand this. And that has to do with this question about awarding damages and a permanent injunction, because you seem to think that if you — if the plaintiff gets an injunction, they can't get damages. Am I oversimplifying that? No, I think in this particular case. Okay. What makes it special about this case? Yeah. Because it starts to sound like a license to use the trade secrets. Right. No, I understand. So a couple things to say about it. So the injunction, I think the court recognized here, and if you look at ER 11 where the court enters this decision, it says that, you know, what an injunction does in a case like this is it basically puts the defendant in the place that they were before, you know, entering into the trade secret misappropriation. And the reason why that is is because the injunction is preventing us from using in any way or any of the trade secret information that we, you know, were found to have taken from Comet. Can't use it to develop new products. Can't use it in any other ways. This is a case where the trade secrets that we were alleged to have taken were supposedly taken for the purpose of, you know, developing new products. We never actually got to market with a new product. So this information was never actually used. Is that fact critical to your argument about no damage, about either damages or an injunction? It is, because where the nature of the damage is is essentially that you have got you have benefited from the fact that you've gotten a head start, where there's essentially it's agreed. Both parties agreed there was no damage to Comet. Comet never suffered any loss. There was no competitive harm. Nothing was revealed to the market about its trade secrets. So this was purely unjust enrichment damages from the idea that we got the benefit of a head start. But once an injunction is entered that prevents us to counsel, I'm sorry. Please help me understand the textual basis for your argument in the defense of trade secrets act? So I don't think there's a dispute that you can't have double recovery under the trade secrets act. As a general principle, that's going to be true, but we usually think about that in terms of damages. So can you point me to the textual basis for saying that in this case it's damages or an  You're saying the textual basis in the statutory language? The statute. I guess the best thing that I could point you to is that in the uniform trade secrets act, which is what the defend trade secrets act is based on, there is language, and I'm not sure whether this is, I doubt this is in the statute itself. It might be in the comments from the drafters. But that says basically where you have an injunction and damages for the same period don't mix. Not for the same period. Okay. But, again, I'm looking for Federal statutory language that we're applying here that would support your, frankly, kind of improbable proposition. I don't think it's improbable at all. This is exactly what the Second Circuit held in the Sintel case. And it's not so much an issue of the statutory language. I mean, everybody agrees that both injunctions and avoided cost damages are available under the DTSA. The issue is that, you know, it's, I think it's pretty well established that you can't have a double recovery. And the point, I think, is that if you have an injunction that, and, by the way, we, we. I'm taking your answer to be no, there is no such statutory language. Yeah, no, I certainly. Yes, no, which? I'm sorry? You just said, yeah, no. Which is the answer? No, again, we're not relying on any language in the statute. Thank you. Yeah. We're relying on the fact that double recovery is something that is generally impermissible. And here, we, we, this is, this is not, this isn't some trap that we put them into. They, they, they got damages in this case. They then sought an injunction, and we said, look, if you, if you, if you award an injunction here that takes away the benefit that was the foundation of our unjust enrichment award, then it would, you know, then you will be in a situation where there's double recovery. And at this, and again, this is what the Second Circuit found in the Sintel case. And at this point, they've had the benefit of that injunction at this point. We, we had to spend significant amounts of money. What does that mean, significant amounts of money? I mean, I can't, I can't point to, to, to a dollar amount in the record, but, but the. Since you're comparing it to damages, it would be useful if there were something more specific than significant. Yeah. I mean, what, let me be clear, Your Honor. I'm not suggesting that the amount of money that we spent in complying with the injunction is, is greater than the, the amount of, of money that's at issue in the, in the, that they received in terms of compensatory damages. All, all I'm saying is that at this point, they've had the benefit of the injunction. We've been prevented from doing anything with the, these materials. So why should we then not allow for a damage award and just vacate the injunction going forward? I think the problem at this point is that at this point, that's, that wouldn't, that wouldn't take away the problem of double recovery because they would have already had the benefit of, of three years from the injunction and we can't get back those, those damages. It's an extraordinary theory for the wrongdoer. But, but let me, let me ask you one other thing I wanted to make sure. You're not seeking at this point to revive the unclean hands defense, are you? No, we're not. Thank you. That's all I have. And I'm just, I'm recognizing my time, so I'm going to reserve the remainder of my time if I may. Thank you. Okay, thank you. Mr. Wilcox. Thank you, Judge Nelson, and may it please the Court. Jason Wilcox on behalf of Comet. I agree this is an unfortunate situation that we find ourselves in because of the jury instruction, but it's a situation that's entirely of XP's own making. And in the version of events that you just heard from XP's counsel, they left off the end of the story, which I think is critical here, which is after they made their written objection, there was then the critical moment just before instructing the jury where the district court came in and held the actual charge conference and said, I want to give you a chance to make sure I don't make any errors before we instruct the jury. That's at 979 of the record excerpts. Comet then stood up and objected again to this instruction and to it being on the verdict form that was broken out separately. They would have readily ascertainability as a question for the jury because we viewed it as being subsumed within the independent economic value. The district court then turned to XP and said to XP, I don't want to make your argument for you, but I understand that you've argued in favor of readily ascertainable as a defense in this case, and I'm turning to you, and I want to make sure you want this instruction and you want the jury to be asked about it. And they said, yes, and it's appropriate under the DTSA. I think that makes this case indistinguishable. It does not, because the choice the court was giving the defense was between a bad instruction and no instruction, not a correct instruction. And I, for one, am wondering how you could make your invited error argument without noting the change in position that you all made with respect to the California claim versus the Federal claim. I didn't see that in your argument about invited error. Did I miss it? So it was definitely in the background section of the brief where we pointed out that that is the evolution of events and what happened. And we pointed out in our argument section that, yes, there was the California and the Federal claim that were together in the case. And then when we decided to drop that at the urging of the district court and of XP to streamline the case for the jury, there was then the objection that they made. But then there was this colloquy that happened with the district court. And I don't think the district court was putting them in a bad situation. Again, I think this is like Lorienti, where this court rejected that argument and said they weren't put to that choice. They could have proposed to the district court, I understand that you're making this instruction. We think that you need to make an important correction to the instruction because it gets the burden of proof wrong. But if you're not going to do that, then we definitely don't want the instruction. They had already made that argument an objection, correct? Yes. And it had been repeated. And it had been overruled by the court, correct? Correct. Were they required to repeat it to avoid invited error at that point? Lorienti says yes. That's exactly what happened in Lorienti. That's at 611 or, sorry, Lorienti is, yes, 611 F3rd 544, where what had happened is there had been a written objection, and then the instruction came up again and a party sat silently by and didn't raise, hey, we still think this instruction is wrong, and this court said it was invited error to do that. And it also said they weren't put to the Hobson's choice of accepting a bad instruction. It doesn't seem to be exactly what happened here because they still did object, but then he asked them again. I guess your point is when they didn't re-raise the objection after he asked for clarification, that was invited error. Yes, exactly. It's at that moment that it's invited error. What's ironic about this is you'd also raised objections to the jury instruction before. I mean, I don't want to be callous here, but it's sort of this, I mean, it's like you're sitting at council tables saying, well, we know this is wrong, but we're just going to take a risk that this is invited error. And I don't know if that was really going through your heads at the time, but that's a big risk to take. I mean, you've got a, what are we talking about, $60 million, $57 million judgment here that rests on, I mean, in hindsight, would you have done this differently and said, hey, you know what, let's just get this right. Let's get the law right on this because you knew it was wrong. We knew it was wrong, which is why from the very first time this instruction came up, we objected. I understand, but then why didn't you stand up and say, I mean, there's some errors that are just so fundamental. It's like it doesn't benefit you to have some technical argument at the end of the day. Get it right if you want to maintain a $57 million judgment because you're in here making a very technical argument that you knew could have been prevented yourself. And we did try to prevent it even at the charge conference. If you look at pages 979 to 980 of the record excerpts, which is where we are making our charge conference, we stood up again and told the district court, we don't think that this should be broken out on the verdict form. We don't think it should be in the instructions because we think it's wrong. It's going to risk possibly having inconsistent verdicts if you have the jury get in the same instruction twice between the independent economic value instruction and this instruction. So we did stand up. Well, that's a different argument. I thought you were objecting to it having argument at all, not whether or not the burden was on the right side. At the charge conference? Yes. Now, throughout the case, if you look at every objection that we made, every time before the charge conference, we pointed out consistently it gets the burden of proof wrong. It's not an affirmative defense under the DTSA. And every time XP objected and said, no, no, this is the instruction we want. Can I ask you, you were referring to a case called Lorienti a moment ago.  Is that cited in your briefs? It is. I can get you the page in a second. I don't have it handy. But it was cited in our briefs. The main reason I know that is I wouldn't have found it if I wasn't in our briefs. Well, I thought I have these open, and I'm looking at them. Well, I'd appreciate it at some point if you'd let us know what that is. Yeah. Maybe what I can do, and I understand this is a little bit unorthodox, but when they do their rebuttal, maybe I can just stand up, and the only thing I will say after the rebuttal is where we cite it, just to get you that citation. That would be helpful. Or my colleague will look for it while I'm up here, so maybe we can short-circuit that. But turning to harmlessness, and in particular the evidentiary issue. Yeah, that's what I'm concerned about. Yes. So first off, I think that you're, Judge Bumate, getting at exactly the right point, which is the real nub of these trade secrets, there was no evidence from the other side that they were readily ascertainable. So, for example, if you look at 1468 of the record excerpts, we ask our witness for trade secret E, what are the components that make up trade secret E, the next generation RF matching network? And our witness responds, so in this case we've broken it into four categories. They're the input and output sensors, the controls and sensor firmware software, the motion control, and the calibration. So let's start with the software. Opening up a match and looking at it isn't going to tell you how the software works, and there was no evidence from the other side on that. Same for calibration. Opening up a match isn't going to tell you how you calibrate all the components that are in there and tell them how to work. Instead, all the evidence from the other side, which came in primarily at two places, it was at 741 and at 769-71, was we could open this up and you could see the dimensions, and you could see kind of the structure and maybe the name of a component. But you wouldn't understand how it all works together. Yeah, you couldn't understand how it all works together. You certainly couldn't understand how the software works, which is why, as we pointed out at pages 229 and 230 of the record excerpts, which is the trial transcript, they had our software, and they were using our software to figure out how this works. So everything we were actually arguing were the trade secrets here were things that you couldn't just figure out by opening it up. Instead, you had to actually have this information that's not readily ascertainable. There was no argument from the other side that pointed to those types of core issues. No, here's how you could figure it out from opening it up. The other important thing to understand on this argument about opening it up is they're not talking about actually opening up Comet's products and looking at how Comet's products work, because if you look at Appendix 1417 and 318-19, the next-generation Comet sensors and controls weren't on the market, so there was nothing to open up. Instead, what they were saying is, well, if you opened up something that came from advanced energy, you'd be able to figure out what components were in the advanced energy product. Well, that doesn't tell you about Comet's trade secrets. That'd be like saying, especially given it doesn't give you all these details about what's in there in the software, that'd be like saying, well, because the Pepsi can lists some ingredients on it, that must mean that Coke doesn't have a trade secret on its formula. Do you agree that it's irrelevant whether or not they actually put on evidence that that's how they constructed it, that they looked at the product and opened it up and then figured it all out? Is that irrelevant for this question of harmlessness? So I agree that ready ascertainability is about whether it's readily ascertainable to the person as a whole. It's not whether they actually did it or not. But again, I think the evidence here makes it more likely than not, which is the standard, that it would not have been readily ascertainable to someone how to figure out how the software works, how the calibration works, how the actual firmware inside it works. Do you agree that this was a contested issue, though, at trial? It was contested whether it was readily ascertainable, although, again, contested only in the sense that they have two places where their witness talked about it briefly in the response of like two or three Q&As. And if you look at one of those Q&As, which is at 771, their expert actually says not readily ascertainable. He says these things were generally known, which is, of course, a different element of the trade secret claim, one where it's undisputed we had the burden and one where the jury found for us. So I think that, again, is another indication of the harmlessness here, if you look at it that way. And then the final thing that I will say on harmlessness, unless the Court has other questions about it, is when this case had both the California trade secret claim in it and the federal trade secret claim, XP agrees that the burden of proof is different from those, that under federal law they don't have the burden, under California law they do, yet the proposed instructions that they put forward to the district court and that the district court accepted, merged those two together and put the burden on them, and they were perfectly happy to take that burden on up until the California trade secret dropped out of the case. If you actually thought this was going to be a close case where the burden of proof was going to make a big difference, you would not propose an instruction that looks like that. You would make sure the DTSA instruction puts the burden on you rather than lumping the two instructions together and saying, we're okay having one instruction that puts the burden on us, even though that's not actually the right burden under federal law. And so I ultimately think that Mockler and other cases from this Court have said that even on burden of proof issues, it can be harmless. And given the overwhelming evidence here, that was largely undisputed, that you couldn't just open up the matches and figure out what was going on with these trade secrets, there is no problem here. I guess the other part of harmlessness that they point to is some patents. I didn't hear it today, but they talk about it in their brief, so just to touch on that briefly. That obviously actually goes to whether it's generally known in the art, which was an issue that we had the burden on and the jury found in our favor. So I don't think that the fact that you could find some cases... Doesn't it go only to that issue? Well, that was the way that they argued it to the jury. I think that was how the jury understood it. And also, I think even if you want to go and look at the patents, all the testimony is just, again, you could find out high-level details of these are the typical things that you would put into an RF power product. None of them got into the actual details of the trade secrets here, like how do you actually calibrate them, how do you actually manufacture them, how do you design the software, all of those things. It was just not there. And then I understand that there was not a lot of argument on this from the other side, but I do think that the instructions as a whole also get us to the same place. Can we move on to the evidentiary question of ownership? Sure. Because ownership is an element, and there was some evidence that was excluded that dealt with ownership. So I'm not sure that I agree that it went to ownership other than them. I mean, I understand they nodded in that direction, but the district court is the one who's living through the case and seeing how it's developing, and I think that he could see that the way that they really wanted to use this evidence was not to go to ownership but was intent to tell a story that was, well, if we stole something, we think Comet stole something too, and so a pox on both your houses. Okay, so is that your distinction? I mean, if we think that it goes to ownership, did the district court abuse its discretion? No. Even if you think it goes to ownership, the district court didn't abuse its discretion because the district court is still the one that has, in the words of the Espinoza case, can see the dynamics of trial and how they're actually going to use it and can see that regardless of whether they think it might go to ownership, the way they really want to use this is to tell a pox on both your houses story to the jury. And you can tell that even from just looking at where they're arguing to get this evidence in. So look at 1446 to 1447 of the record excerpts. They say one sentence about ownership. They say this goes to ownership, but they don't explain why. And then the rest of their argument for how this comes in is, well, we heard testimony from comments witnesses about how it was wrong that XP stole this material. This testimony goes to the court. So if I understand it, so the district court understood that they might be presenting it as ownership, but they — it was essentially the district court viewed it as a pretext to get this unclean hands argument before the jury. Is that — Exactly. The jury — or, sorry, the district court understood that even if they think this is going to ownership, which they never really connected the dots of how this evidence went to ownership, it was a pretext for what they really wanted to do. And you can see that, again, in their own arguments. If you look at 1440 — And then your argument would be that that's within the district court's discretion to do that. So — Yes, certainly. But the — if I recall correctly, didn't the district judge exclude, eliminate anything having to do with an unclean hands defense? The district court did eliminate — well, yes, excluded anything having to do with unclean hands events and struck from their expert report information that they only put in for the purpose of unclean hands. So the jury — did the jury ever hear the words unclean hands in this trial? The jury never heard the words unclean hands. But just because they weren't going to say the words doesn't mean that they weren't going to try and make the argument and give the jury the implication of — Well, if you guys stole it first, that would mean you don't own it, right? If we stole — I'm not — if we stole it first, we wouldn't own it. Of course, all that they were saying is this person worked on it somewhere else. That's what they — when we got to trial, that's what they were trying to present, was just — Okay, well, that sounds to me like an ownership defense. I'm trying to understand, given — the district court seemed to be speaking under Rule 403 in terms of prejudice and confusion. And I guess I'm having trouble understanding if the unclean hands defense was not going to be in front of the jury, what would be unfair or prejudicial about putting in evidence that you guys didn't own some of the trade secrets? What was going to be unfair and prejudicial about it was that was not how they were going to use it. They were going to use it to tell this pretextual story. And again, if you look at 1446 to 47, what they said is we need to get this in to tell the corollary story, too. Well, they think that we stole it. We think that they acted poorly, too. If you look at 1486 to 87, this comes up again where they try and get it in again. And here's what they say to the district court. They say we opened the door because we had a witness get on the stand and say when you walk out the door and leave, you say goodbye and thank you. You don't steal information with you on the way out the door. We need to be able to tell the jury that they did the same thing. That's not going to ownership, and they didn't say anything about ownership in that colloquy. It's going to unclean hands in trying to tell the story of, well, they think we did bad things. They did bad things, too. That's the story they wanted to tell the jury. They wanted to tell an equitable story to the jury. And then the other place where they object to the admission where their evidence didn't get in at 651, they didn't say a word about ownership in trying to get that evidence in. So that can't possibly have been excluded for the wrong reason in going to ownership, because that wasn't the argument they made to the district court. And you view the district court on discretionary rulings based on what were the actual reasons that were given to the district court, not in hindsight what are arguments you could come up with after the fact. So I think that this falls well within the district court's broad discretion to they really contested until we started trying to get out the unclean hands evidence. If you look at their interrogatory responses. So did they ever concede ownership? They never conceded ownership. But if you look at their interrogatory responses, all they said on it was, we have the burden to prove ownership. They otherwise didn't try and elaborate on how there was a failure of  Were those interrogatory answers before or after Mason's additional devices were discovered? So they were after the Mason devices were turned over by XP because we had to file a motion to compel. But if you look at pages 162 to 163 of the supplemental excerpts of record, many of the documents that they say they wanted to get in, they actually had in their possession. And they can't and now they have them in their possession. But we had produced them in discovery with metadata showing that they came from Mason. So if they wanted to make an argument of Mason had advanced So you're saying that they fell down on the job because they didn't get into the data to figure out that Mason and company had brought it from a prior employer? They should have figured that out first? They should have figured it out or they should have tried to develop it. But my real point is this unclean hands was the argument and how they said they were originally bringing in all of this new Mason information. You can see that at page 332 of our supplemental record excerpts. And it was only after we then moved to get rid of the unclean hands defense and to say you should strike this that they started saying, well, actually, maybe it goes to ownership. The district court, again, is seeing all of this play out, sees how they want to use it at trial, and it's well within its broad discretion to make the judgment call that I don't think this is coming in for a proper purpose. This looks like you're trying to bring it in to tell a pox on both your houses story. Let me just turn, if I may, to the damages and permanent injunction issue. So I think that you're exactly right, Judge Hamilton, which is there's no double recovery happening here. What's happening is the unjust enrichment award is covering what happened in the past. It's the fact that they saved all of these development costs that they otherwise would have incurred and would have spent to try and have these trade secrets. And then when we get to the injunction, it's preventing the forward-looking harm of them continuing to use it. So one way to look at it. Can you address the, wasn't it the Second Circuit case that counsel says points the other direction? Yes. So I think it was the Second Circuit decision in Sintel. So Sintel didn't actually deal with this double recovery issue of injunction versus unjust enrichment. It instead held that you can't get unjust enrichment damages unless you as a trade secret owner suffer compensable harm beyond its lost profit or profit opportunities, and that's what it held. That's been rejected by five other circuits. The most on-point case here is the PPG case from the Third Circuit, which did address this exact issue and did exactly what the district court did here and said, no, those avoided cost damages. Those are going to the past. The injunction's going to the future. Just like the facts here, the injunction got put in place before a product went to market, so this was not a situation where a product was going on the market and that's why you're cutting it off. It wasn't on the market yet. What my friend on the other side has said about PPG in the past is that, well, they were already building a production facility to make this stuff, and so there was still the residual value of the production facility. Number one, that's not what the PPG court said. Number two, the production facility was to make this information, was to actually make the trade secret product, so I'm not sure what residual value it would have had. And number three, the damages that were rewarded were not the residual value of the production facility. They were the avoided costs from misappropriating the trade secrets rather than engaging in the development work. I see my time's up, so I welcome any questions the Court may have, but otherwise ask that you affirm. Robertson, Jr. Yes, please. Are there any claims at this point pending against the individuals involved in this Mason & Company? There are no claims pending against them. And I'm sorry, I thought of one other quick thing. You dropped those? To the extent that there were ever claims against them, they've been dropped, yes. It's only pending against the company. They were apparently filed earlier. Yes. The only thing — What else do you want to tell us? Yes, one second. On your statutory point of what's the statutory authority for their argument, what I'll say is what the statute does point to is if you're going to give the — if you're going to give the argument, the statute tells you what the remedy is, and it's not to get rid of the damages award. It's to give us a reasonable royalty going forward. Because what the statute says in 1836, I believe it's A.3. Maybe it's B.3. It says — it's 3A. Sorry. 1836, 3A. What it says is in the exceptional circumstance where an injunction isn't appropriate for some reason, avoid a — or, sorry, a reasonable royalty is the appropriate remedy going forward. Thank you. Okay. Thank you. I'll just make a couple of points. First, with respect to the evidentiary issue, and then I want to address two things going to the instructional. I'll say one last thing. So on the evidentiary, did you tell the district court you wanted that as ownership evidence? Throughout the case and a trial. My friend said look to ER 1446, and you'll see that this is going to unclean hands. This is what we said at ER 1446. Quote, this has nothing to do with unclean hands. This testimony has everything to do with ownership, which Your Honor noted was still an issue to be tried in your order denying Comet's MIL-5. And that was a piece with throughout the case. If you look at the — But couldn't the district court just think of it as a pretextual argument to get the unclean hands? No, because the two things are going to different — unclean hands and ownership go to different things. Yes, of course, there's — well, let me explain why. Unclean hands is going to intent, right? It's going to the idea that Comet is a bad actor. Right. Ownership doesn't assume that they knew that this was coming from AE. We don't — we don't have to prove that they did anything wrong in terms of, like, knowing — you know, intentionally trying to take the change ticket. It's just a question of, you know, did this material have — is this material that you owned, or is it — did you not own it because it came to a third party, as Judge Hamilton noted? And I think, like, the — you know, the idea that the jury was going to — But to get to that story, though, you'd have to explain that they stole it from the other — You have to — you don't have to say that, like — you don't have to say that Comet intentionally stole it. You have to say that this is information that came from a third party. But surely — but surely we can't be prevented from — from making a probative argument on ownership. And again, there was — there was, like, files that we pointed to that specifically, like I said, 4X sensor that — that, you know, were taken from AE. I want to quickly address two — two very important points going to the — the jury instructional error. First, you know, I heard my friend say that the — what you look to to find invited error here is that final colloquy on 979 of the record. What happened there was the court first said, is there anything else that we need to address that's not already covered by the objections that were given? And we said, no, we think we've said everything. It's all preserved. Then Comet said, as — as he admitted, they changed their tack from saying, hey, you've got the — the burden of proof wrong to saying, hey, there shouldn't be an instruction about readily ascertainable at all. And the court then said, well, I'm not making the argument for them, but I think they've said that that should be part of the case. And so all we were saying when we said, yes, we think that's correct under the DTSA is that readily ascertainable is — is part of the case. And that's where we were putting that catch-22 of — of getting an instruction with the wrong burden of proof of having it, not at all. And I'm sure if we had gone the other way, they would be saying we've done invited error, and that can't be right. They — they talk about harmlessness, and — and I think there's two important points to make about that. I — I think my friend kind of pivoted a little bit from what's in their brief, going from the why to now saying, well, there are different components out there. I — I think there's two things that are really important to understand. In — in order for them to prove their trade secret case, they obviously didn't have to just show that there was a trade secret, but that we used that trade secret. And when they made the argument to the jury about what did we use on trade secret E, the thing that they pointed to, and the only thing that they pointed to at closing arguments, was this forex sensor. That's what they kept pointing to time and time again over the course of the case as what it was that we were using. And, you know, I'll — I'll just point to some examples. ER-212. It's that same sensor again. ER-226. There's the sensor block diagram again. 1021. Were the sensor files used? Of course they were. That's, again, in 1020 to 22 is that — is the closing. That's the only thing that they were focused on. And I will just point out that, you know, to the extent that basically there's an argument that some — some important components of the trade secret here were readily ascertainable and others weren't, again, I think that that's the kind of where, at minimum, you can't say that it's harmless. You can't — this can't be the rare circumstance where you know, based on what's in the — what's in the record, that the jury would have come out the other way. It's — you just have to have a new trial. Thank you very much. Thank you. Thank you to both counsel for a very well-argued case. The case is now submitted. And that concludes our arguments for the week. All rise.
judges: Hamilton, NELSON, BUMATAY